### A08A1046. PARGAR, LLC v. JACKSON et al.
(670 SE2d 547)

PHIPPS, Judge.

Pargar, LLC, d/b/a Prudential Georgia Realty, sued Robert and Cheryl Jackson for a real estate commission. On cross-motions for summary judgment, the trial court ruled in favor of the Jacksons, finding no evidence that the parties had agreed to a commission amount. Because Prudential has shown no error, we affirm.

"Summary judgment is appropriate when the evidence, construed most favorably to the non-moving party, demonstrates that no genuine issues of material fact remain and that the movant is entitled to judgment as a matter of law."[1]

On November 28, 2005, the Jacksons executed a purchase and sale contract with the owners of residential real property, agreeing to buy their property. The Jacksons later elected not to close upon the sale. Prudential sued the Jacksons, alleging that their breach of the purchase and sale contract required them to pay it a commission of three percent of the purchase price of the property.

The purchase and sale contract identified Prudential as a broker. In support of its claim, Prudential relied upon language within the contract's Paragraph 10 (b) that:

Broker(s) identified herein have performed valuable brokerage services and are to be paid a commission *pursuant to a separate agreement or agreements*. Unless otherwise pro-

---

[8] See *Campbell v. State*, 279 Ga. App. 331 (631 SE2d 388) (2006); *Thompson v. State*, 237 Ga. App. 466 (517 SE2d 339) (1999).

[9] See OCGA § 16-1-7.

[1] *Mitchell Realty Group v. Holt*, 266 Ga. App. 217 (596 SE2d 625) (2004) (footnote omitted).

vided for herein, Listing Broker will be paid a commission by Seller, and the Selling Broker will receive a portion of the Listing Broker's commission pursuant to a cooperative brokerage agreement. . . . In the event the sale is not closed because of Buyer's and/or Seller's failure or refusal to perform any of their obligations herein, the non-performing party shall immediately pay the Broker(s) the full commission the Broker(s) would have received had the sale closed, and the Selling Broker and Listing Broker may jointly or independently pursue the non-performing party for their portion of the commission.[2]

It is undisputed that prior to executing the purchase and sale contract, the Jacksons entered into a separate agreement with Prudential. On November 1, 2005, an Exclusive Buyer Brokerage Agreement was executed by the Jacksons as buyers and Prudential as broker. This agreement was a pre-printed form, and it contained a paragraph entitled "Commission," which set forth terms concerning how a broker would be paid for its services and blanks for the parties to identify a commission percentage of the purchase price or, alternatively, a dollar amount the broker would be paid. But handwritten across the entirety of that paragraph was "N/A." The real estate agent who had worked with the Jacksons deposed that she had stricken the Commission paragraph in accordance with her understanding of Prudential's policy regarding relocation clients, such as the Jacksons.

The Jacksons moved for summary judgment on the ground that Prudential had failed to present a separate agreement establishing an agreed-upon commission, citing Georgia's Brokerage Relationships in Real Estate Transactions Act (BRRETA)[3] and *Mitchell Realty Group v. Holt*.[4] In *Mitchell*, a broker filed suit to obtain a brokerage commission allegedly owed it by a party who had agreed to purchase real property by executing a purchase agreement, but then refused to close on the real property transaction.[5] Pertinently, the broker in *Mitchell* relied upon contractual language virtually identical to the language relied upon by Prudential in this case.[6] After noting that the case was governed by BRRETA, we determined in

---

[2] (Emphasis supplied.)
[3] OCGA § 10-6A-1 et seq.
[4] Supra.
[5] Id.
[6] Id. at 218.

*Mitchell*:

> [t]he legislature clearly intended that agreements between a broker and its clients regarding the amount of brokerage compensation be placed in writing. In this case, however, there is no evidence of such a written agreement between any parties. The purchase agreement states that [the broker] will be paid a commission, but does not specify the amount, referring instead to "a separate agreement or agreements." And the record contains no other written contract establishing the amount of [the broker's] compensation.[7]

Because the broker thus had failed to "establish that it was entitled to recover a contract-based commission under [the cited language] of the purchase agreement,"[8] we affirmed in *Mitchell* the trial court's rulings against the broker on the parties' cross-motions for summary judgment.

Opposing the Jacksons' summary judgment motion, Prudential argued that neither BRRETA nor *Mitchell* authorized a ruling in their favor. Prudential claimed that, because it was seeking to enforce the terms of the purchase and sale agreement, not the Exclusive Buyer Brokerage Agreement, the lack of compensation terms in the latter did not preclude it from recovering a commission. Prudential cited *Killearn Partners v. Southeast Properties*,[9] arguing that the Supreme Court of Georgia held in that case that the complete absence of any written agreement between a broker and its client did not preclude the broker from seeking compensation.

Further, Prudential sought summary judgment on the ground that the Jacksons' breach of the purchase and sale contract entitled it, pursuant to the language it cited therein, to the claimed commission amount. As written proof of the alleged three-percent commission amount, Prudential relied upon two documents. One document was a First Multiple Listing Service (FMLS) listing for the property that showed "Selling Commission: 2.5" within its "Office Information" section. The real estate agent deposed that she had handed Mr. Jackson the FMLS listing the first day they went to visit the property, but never discussed the two and a half percent with either him or Mrs. Jackson. She testified, however, that she informed Mr. Jackson that she would be asking from the sellers an agent bonus in an amount of 0.5 percent of the purchase price.

---

[7] Id. at 219 (footnote omitted).
[8] Id. at 220 (footnote omitted).
[9] 279 Ga. 144 (611 SE2d 26) (2005).

The other document relied upon by Prudential to establish a commission of three percent was entitled "Instructions to Closing Attorney/Commission Confirmation Agreement." This document identified Prudential as the Selling Broker; named the Listing Broker; contained the signature of the real estate agent as Prudential's representative, as well as the signature of the Listing Broker's representative; and provided:

> Listing Broker is to be paid a real estate commission by the Seller upon the closing of the [purchase and sale agreement]. . . . Listing Broker agrees to share its commission with the undersigned Selling Broker as set forth below. Selling Broker shall receive a commission of 2.5 percent (%) of the purchase price of Property. . . . Selling Agent to receive additional .5% of purchase price as agent incentive/bonus.

The real estate agent deposed, however, that this document was not provided to the Jacksons.

After a hearing on the parties' motions, the court ruled in the Jacksons' favor.

1. Prudential contends that the trial court erred by denying its motion for summary judgment and granting summary judgment to the Jacksons, contesting the application of BRRETA and *Mitchell* to this case. We find no merit in this contention.

(a) BRRETA "define[s] the legal relationships between a real estate broker and the other parties to a real estate transaction."[10] Their duties vary, depending upon whether a "customer" or a "client" relationship exists.[11] The Supreme Court of Georgia has held that BRRETA "require[s] that broker-*client* relationships be created by written brokerage agreements."[12] Similarly, as stated above, this court has held, "The legislature clearly intended that agreements between a broker and its clients regarding the amount of brokerage compensation be placed in writing."[13]

Contrary to the position taken by Prudential during litigation, the record establishes that BRRETA governed the parties' relationship. An agreement was executed by Prudential and the Jacksons, as broker and clients. The Exclusive Buyer Brokerage Agreement, which was presented to the Jacksons by the real estate agent, had printed in its top margin: "State law prohibits Broker from repre-

---

[10] Id. at 145 (1) (punctuation and footnote omitted).
[11] See id. (contrasting the duties).
[12] Id. at 146 (footnote omitted; emphasis supplied).
[13] *Mitchell*, supra at 219 (footnote omitted).

senting Buyer as a client without first entering into a written agreement with Buyer under OCGA § 10-6A-1 et seq." Further, the Exclusive Buyer Brokerage Agreement listed as a broker's duty to buyer: "comply with all applicable laws in performing its duties hereunder including the Brokerage Relationships in Real Estate Transactions Act, OCGA § 10-6A-1 et seq." Notably, Prudential's vice president deposed that the purpose of the Exclusive Buyer Brokerage Agreement was "[t]o adhere to the state law" and then referenced the statement printed in its top margin. And she characterized the Exclusive Buyer Brokerage Agreement as a "brokerage engagement."

A "brokerage engagement" is defined by BRRETA as

> a written contract wherein the seller, buyer, landlord, or tenant becomes the client of the broker and promises to pay the broker a valuable consideration or agrees that the broker may receive a valuable consideration from another in consideration of the broker producing a seller, buyer, tenant, or landlord ready, able, and willing to sell, buy, or rent the property or performing other brokerage services.[14]

Under BRRETA, "[a]ll brokerage engagements must . . . [a]dvise such prospective client as to the broker's compensation."[15] In this case, however, the only paragraph expressly dealing with the broker's compensation was intentionally stricken by the real estate agent. Consequently, Prudential cannot rely solely upon the Exclusive Buyer Brokerage Agreement to support its breach of contract claim for a three-percent commission.

(b) Prudential argues that its claim is not precluded by the absence of compensation terms within the Exclusive Buyer Brokerage Agreement, citing the purchase and sale contract. Indeed, the Exclusive Buyer Brokerage Agreement imposed upon the Jacksons a duty to comply with "the terms of any purchase agreement and other documents which [they] may sign." The only document Prudential adduced as signed by the Jacksons was the purchase and sale contract.[16] But it did not specify any commission amount, referring instead to "a separate agreement or agreements."

In an attempt to show such an agreement, Prudential cited a document entitled "Instructions to Closing Attorney/Commission Confirmation Agreement." It was signed only by representatives of the brokers, and there is no assertion that any such signature bound

---

[14] OCGA § 10-6A-3 (4).

[15] OCGA § 10-6A-10 (3).

[16] As pointed out by Prudential's vice president during her deposition, Paragraph 10 (B) of the purchase and sale contract expressly referenced BRRETA.

the Jacksons. Thus, this document provided no evidence of an agreed-upon commission amount between the Jacksons and Prudential.

Prudential also cited an FMLS listing for the property that stated "Selling Commission: 2.5." This document was unsigned, identified neither Prudential nor the Jacksons as parties, and indicated no assent to any contractual terms. Although Mr. Jackson was handed the listing by the real estate agent, there is nothing to show that he or Mrs. Jackson thereby agreed to pay any commission. To be sure, the real estate agent was asked during her deposition: "[Other than] notifying them that you were asking about the half percent, did you have any other discussions with the Jacksons specifically regarding the amount of your commission?" She answered, "No, because the commission is paid, by the seller. So I didn't see any reason to discuss it with the buyer when it's paid by the seller." Thus, the FMLS listing provided no evidence of an agreed-upon commission amount between the Jacksons and Prudential.

Under these circumstances, the trial court correctly decided that this issue was controlled adversely to Prudential under *Mitchell*. Having presented no evidence of a written agreement between it and the Jacksons specifying the commission amount,[17] Prudential has failed to "establish that it was entitled to recover a contract-based commission under [the cited language] of the purchase agreement."[18]

2. Prudential contends that, notwithstanding the absence of a written agreement concerning a commission amount, it should not be barred from recovery, citing the following language from *Killearn*:

Nowhere in BRRETA is there any mention of when or under what circumstances a real estate agent may assert a claim for payment owed in exchange for services rendered. Nor does BRRETA indicate that a written agreement must exist before an agent may claim such payment. We believe this silence demonstrates that the legislature did not intend for BRRETA to regulate real estate commissions or remuneration payments, but rather . . . is concerned primarily with the question of whether and under what circumstances a client or a customer relationship arises, and what duties are owed within the context of each.[19]

---

[17] See generally *Lifestyle Family, L.P. v. Lawyers Title Ins. Corp.*, 256 Ga. App. 305, 309 (1) (568 SE2d 171) (2002) (amount of the commission is an essential term of breach of contract claim for brokerage commission).

[18] *Mitchell*, supra at 220 (footnote omitted).

[19] *Killearn*, supra at 146-147 (2) (footnote omitted).

The issue in *Killearn*, however, was whether BRRETA prevents "a real estate professional from seeking *a common law remedy such as procuring cause or quantum meruit when no written brokerage engagement agreement has been executed.*"[20] The Court held that "the absence of a written agreement between a real estate professional and a client does not preclude the former from seeking to recover compensation under remedies found outside the scope of BRRETA, including those at common law."[21]

In this case, Prudential concedes that a written brokerage engagement *was* executed, and the evidence is undisputed that its Commission paragraph was stricken. Prudential thus cited the purchase and sale contract in an effort to substantiate what was essentially a claim for breach of express contract. But the purchase and sale contract also failed to show an agreement as to the amount of the commission. Finally, unlike the broker in *Killearn*, Prudential pursued no common law remedy such as procuring cause or quantum meruit. Under the circumstances presented here, nothing in *Killearn* provides for an outcome in Prudential's favor.

*Judgment affirmed. Barnes, C. J., and Johnson, P. J., concur.*

DECIDED NOVEMBER 26, 2008.

*Dickenson Gilroy, Monica K. Gilroy*, for appellant.
*Raley & Sandifer, G. Brian Raley*, for appellees.
*Weissman, Nowak, Curry & Wilco, Seth G. Weissman, Ned Blumenthal*, amici curiae.

---

[20] Id. at 144 (footnote omitted; emphasis supplied).
[21] Id. at 147-148 (3).