**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**August 8, 2024**

# In the Court of Appeals of Georgia

A24A1072. KIDD et al v. METRO BROKERS, INC. et al.

DILLARD, Presiding Judge.

This case involves an issue of first impression in Georgia: Whether real estate brokers or agents can be held responsible for injuries sustained by a visitor on property listed and shown for sale. The short answer is possibly—but not under these circumstances.

Kenneth Kidd filed suit against Metro Brokers, Inc.; Jack Scott Stanley, III; and Oliver A. Alexander,[1] individually and as the administrator of the estate of his deceased wife (Anna Loraine Kidd), who tragically passed away after falling and striking her head at a home listed for sale and shown by appellees. In the wake of the

---

[1] These parties will be referred to collectively as "appellees."

trial court's grant of summary judgment in favor of appellees, Kidd argues the court erred in finding (1) agents and brokers are exempt from OCGA § 51-3-1 as a matter of law; (2) the Brokerage Relationships in Real Estate Transactions Act exempts brokers and agents from tort liability as a matter of law; (3) Anna was a licensee rather than an invitee; (4) a static condition caused Anna to fall, rather than a hidden peril; and (5) a broker is not liable for the negligence of its agents. For the following reasons, we affirm.[2]

A trial court may grant summary judgment when there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[3] And we review a grant or denial of summary judgment *de novo*, construing the evidence "in the light most favorable to the nonmovant."[4] So viewed, the record shows that on October 19, 2019, Kenneth and Anna Kidd, along with their son Adrian,

---

[2] Oral argument was held in this case on June 20, 2024, and is archived on the Court's website. *See* Court of Appeals of the State of Georgia, Oral Argument, Case No. A24A1072 (June 20, 2024), *available at* https://vimeo.com/966877347.

[3] *Cross v. Wilmington Tr., Nat'l Ass'n*, 360 Ga. App. 747, 748 (860 SE2d 212) (2021) (punctuation omitted).

[4] *Id.* (punctuation omitted).

accompanied their other son, Patrick, to view a home that he was considering buying. At the time, Patrick was working with Stanley to identify a home for purchase.

The group arrived at 170 Heritage Way in Covington to meet Stanley and began walking through the rooms of the house, which was vacant. Stanley had not previously visited the property, and the listing agent, Alexander, was not present during the showing.

While exploring the home on her own, Anna—who was then 73 years old and using a cane—missed a single step leading from a hallway down into a room that previously served as a garage. The others heard the noise of her fall and rushed to see what happened. They found Anna beginning to sit up in the middle of the room, bleeding from her right temple with the cane beside her. Anna told the others she had fallen after stepping into the room and hit her head on the floor. The step down from the hallway into the room appeared to be level with the floor in the room, and Anna had not seen the step before attempting to enter the room.

Anna was able to communicate and walk back to Patrick's car, and the family then drove her to the emergency room of a nearby hospital. Once there, Anna was taken for an MRI, but after it was completed and she was being transferred into a

chair, she slipped into a coma. Anna was then transferred to the trauma center at Grady Memorial Hospital due to bleeding in her brain. She never awoke from the coma, and passed away a little less than two weeks later.

On June 24, 2021, Kidd filed suit against appellees, bringing claims on behalf of Anna's estate to recover medical and funeral expenses on the basis of appellees' alleged negligence, as well as for loss of consortium. Almost two years later, on June 13, 2023, appellees filed a motion for summary judgment, asserting that (1) Kidd's claims failed as a matter of fact and law because they were not owners or occupiers of the property; (2) the Kidds were licensees and not invitees; (3) the property owner had nondelegable statutory duties; (4) Alexander was an independent contractor and not an employee of Metro Brokers; and (5) Stanley was not involved with the listing of the property. The trial court granted summary judgment in favor of appellees in a brief order, which included no explanation as to its reasoning. This appeal by Kidd follows.

1. First, Kidd argues the trial court erred by concluding that real-estate agents and brokers are exempt from OCGA § 51-3-1 as a matter of law. We agree with the

trial court that in *this case* neither the broker nor the relevant agents were occupiers of the subject property so as to bring them within the ambit of the statute.

In a cause of action based on negligence, Kidd bears the burden of establishing four essential elements:

> (1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.[5]

Summary judgment is, of course, appropriately granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[6] And when a defendant seeks summary judgment, the defendant "may do this by either presenting evidence negating an essential element of the plaintiff's claims or establishing from the record

---

[5] *Scott v. Forest Acres Full Gospel Church*, 352 Ga. App. 145, 148 (1) (834 SE2d 286) (2019) (punctuation omitted).

[6] OCGA § 9-11-56 (c); *accord Graham v. Hospice Savannah, Inc.*, 368 Ga. App. 91, 92 (889 SE2d 212) (2023).

an absence of evidence to support such claims."[7] Importantly, a defendant who will not bear the burden of proof at trial "need not affirmatively disprove the nonmoving party's case, but may point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of the nonmoving party's case."[8] When this is done, a plaintiff cannot "rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue."[9]

In this case, appellees contend they owed no legal duty to Anna given the foregoing circumstances and thus cannot be liable for negligence. And it is well established that the "existence of a legal duty, which can arise by statute or be imposed by decisional law, is a question of law for the court."[10] So here, the question is whether appellees owed a duty of care to Anna under OCGA § 51-3-1, which provides that "a person who owns or occupies land and by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose,

---

[7] *Morris v. Real Est. Expert Advisors, LLC*, 355 Ga. App. 286, 291-92 (1) (844 SE2d 227) (2020) (punctuation omitted).

[8] *Id.* at 292 (1) (punctuation omitted).

[9] *Id.* (punctuation omitted).

[10] *Ga. CVS Pharmacy, LLC v. Carmichael*, 316 Ga. 718, 724 (II) (B) (890 SE2d 209) (2023) (punctuation omitted).

is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe."[11]

Our analysis begins with the terms of a listing agreement. Lyons Investments, LLC ("Lyons"), entered into a contract[12] with Alexander on behalf of Metro Brokers to list the subject house for sale.[13] The listing period was from September 20, 2019, until December 20, 2019, and the agreement indicated that any affiliated licensees

---

[11] The parties disagree about Anna's status on the property—whether she was a licensee to whom a lesser duty was owed, or whether she was instead an invitee to whom a higher duty was owed. *See, e.g.*, *Scott*, 352 Ga. App. at 148 ("A landowner owes the highest duty—the duty of ordinary care—to an invitee. A landowner owes a lesser duty—to avoid causing wilful or wanton injury—to a licensee." (punctuation omitted)). We assume, for purposes of this appeal, that Anna was an invitee to whom the higher duty, if any, was owed under OCGA § 51-3-1.

[12] As previously noted, we are required to (and do) view the record in the light most favorable to Kidd. *See supra* note 3. And we will only apply the rules of contract construction to the relevant listing agreement when we are confronted with language that is unclear or ambiguous. *See, e.g.*, *Reeves v. Allstate Ins. Co.*, ___ Ga. App. ___, ___ ( 901 SE2d 223) (April 30, 2024) (explaining that the "rules of construction only apply if the language of the contract is unclear or ambiguous in some respect" and that, if the language is "clear and unambiguous, a court merely enforces the contract according to its clear terms and looks to the agreement alone for its meaning" (punctuation omitted)).

[13] Kidd originally sued Lyons as well, but then dismissed Lyons from the action after reaching a settlement agreement.

who helped market or sell the property would be independent contractors—thus creating an independent-contractor relationship between Lyons and Metro Brokers.[14]

Importantly, the agreement between Lyons and Metro Brokers included a provision regarding "hazardous conditions on [the] property," which provided as follows:

> [Lyons] acknowledges that [it] owes a duty of reasonable care to keep the Property safe for prospective buyers and their agents who view and inspect the Property. Among other things, this includes a duty to warn such invitees of dangerous conditions that would not be obvious to an invitee. [Lyons is] encouraged to inspect the Property for hazardous conditions and correct and eliminate all such conditions. [Lyons] agrees to indemnify and hold [Metro Brokers] harmless from and against any and all claims, causes of action, suits, and damages arising out of or relating to a person or persons being injured or harmed while on the Property.

The contract further placed "limits [on] the broker's authority and responsibility" by specifying that Metro Brokers would "be held harmless by [Lyons] for any and all

---

[14] Likewise, Metro Brokers and Alexander entered into an agreement in 2013 under which Alexander operated as an independent contractor. And in 2019, Stanley also entered into an independent contractor agreement with Metro Brokers. Once again, Alexander was the listing agent and Stanley was showing the house to Patrick Kidd as a potential buyer.

claims, causes of action, or damages arising out of or relating to . . . [Lyons's] negligence . . . ; and any damages or injuries occurring on the Property as a result of dangerous or defective conditions on the Property . . . ." Finally, the agreement specified that Metro Brokers would not "have any authority on behalf of [Lyons] other than what is set forth" in the contract.

So, while it is true Lyons vacated the property such that no one was living in the home during the listing period, there is no evidence that Metro Brokers or Alexander undertook any obligation to exert some measure of control over the premises in the owner's absence beyond that of marketing the property for sale and allowing entry to potential purchasers.[15] Indeed, the listing agreement did not delegate to Metro Brokers—or to *any* real estate agent—a duty to maintain the property, make repairs, or otherwise relieve Lyons of *its* duties as the property owner, notwithstanding that Lyons was not currently inhabiting the home. Instead, the contract encouraged *Lyons* "to inspect the Property for hazardous conditions and correct and eliminate all such conditions," and in no way suggests that Metro Brokers or any agent were responsible for these actions.

---

[15] Suffice it to say, Stanley—who was at the home on behalf of a prospective buyer—was under no contractual obligation to assume any of the homeowner's duties.

It is clear by its terms, then, that the relevant contract merely established an exclusive listing agreement by which Alexander and Metro Brokers were tasked with marketing the home for sale. And even in that limited role, Alexander needed the property owner's consent for certain matters, including the hours during which the property could be shown. As a result, under the terms of the contract between Lyons and Metro Brokers (and, by extension, Alexander), neither Metro Brokers nor the real-estate agents involved were given control over the premises such that they could be considered occupiers who owed a duty under OCGA § 51-3-1.[16]

---

[16] *See Nair v. Aramark Food Serv. Corp.*, 276 Ga. App. 793, 795 (625 SE2d 78) (2005) (holding that there was a genuine issue of material fact as to whether a contract between a food-service provider and owner dictated that the provider assumed control over the table at which plaintiff fell); *see also Tamasco v. Rodd*, Case No. A-1574-16T2, 2018 WL 4055919, at *4 (N.J. Super. Ct. App. Div. 2018) (holding that broker and listing agent did not owe a duty to plaintiff injured by slipping on ice- and snow-covered stairs during a visit to listed property because the broker's "relationship to the seller was defined by the terms of the listing agreement" and the broker "did not agree to provide snow removal services"); *Christopher v. McGuire*, 169 P2d 879, 881 (Or. 1946) (concluding that, in the absence of a contractual duty, a selling agent had no duty to keep listed property in repair and that the right of entry to sell property does not put the agent in "possession and control" of the property); *cf. Tisdale v. United States*, 62 F3d 1367, 1369-70, 1373 (III) (B) (11th Cir. 1995) (concluding that the Department of Housing and Urban Development (HUD) relinquished control of property it owned to realty company under a contract by which "a real estate broker or other qualified individual agrees to arrange for and supervise the management, rehabilitation, and maintenance of certain properties that have been acquired by HUD," and under which the company "was additionally required to inspect the

But even beyond the listing agreement, there is no evidence Metro Brokers, Alexander, or Stanley exerted control over the property such that they could possibly be considered occupiers.[17] To be sure, this is a novel question under Georgia law. Even so, there are "open house" cases from other jurisdictions that provide helpful analytical guidance. In these decisions, several appellate courts have concluded that a genuine issue of material fact existed as to the degree of control exercised over a

---

properties covered by the . . . contract on a regular basis and to eliminate any safety hazards that the inspections revealed" and was "authorized to make any necessary repairs up to $1000," making real estate broker an occupier of the land); *Mollino v. Ogden & Clarkson Corp.*, 154 NE 307, 308 (N.Y. 1926) (affirming judgment entered against real-estate broker when it was contractually obligated not just to sell, lease, and manage property but also to see to its improvements and repair).

[17] *See Cajun Contractors, Inc. v. Peachtree Prop. Sub, LLC*, 360 Ga. App. 390, 399–400 (1) (c) (861 SE2d 222) (2021) ("Under the laws of this State, a property owner is not liable to any person who is injured on the property if full possession and complete control of the property were delivered and surrendered to an independent contractor." (punctuation omitted)); *Hess v. Textron Auto. Exteriors, Inc.*, 245 Ga. App. 264, 265 (2) (536 SE2d 291) (2000) ("In [premises liability] cases, liability depends upon possession and control of the premises, and possession means having personal charge of or exercising the rights of management or control over the property in question." (citation omitted)).

property by a broker or agent when an injury occurred during an open house hosted by a listing agent.[18] Significantly, during such events,

---

[18] *See Anderson v. Wiegand*, 567 NW2d 452, 455-56 (Mich. Ct. App. 1997) (noting that subject homeowners "ceded possession of the premises to the realtor, a responsible individual, *for the purposes of conducting the open house* as is common in the real estate industry," and that "[b]ecause the homeowners effectively ceded possession and control of the premises, albeit for a brief time, to the real estate agency, the law is satisfied to look to the party actually in control for liability for injuries to third parties" (emphasis supplied)); *Hopkins v. Fox & Lazo Realtors*, 625 A2d 1110, 1117 (III) (N.J. 1993) ("Based on the *nature and circumstances surrounding an open house*, we conclude that implicit in the broker's invitation to customers is some commensurate degree of responsibility for their safety while visiting the premises." (emphasis supplied)); *Jarr v. Seeco Constr. Co.*, 666 P2d 392, 395 (Wash. Ct. App. 1983) (concluding that there was a genuine issue of material fact as to a real-estate company's status as a possessor of land when there was evidence that "on the day of the accident [the real-estate company] *was in complete charge of the open house* and had the responsibility to control prospective purchasers viewing the property and [the company] was in control of the site and buildings as they related to the showing of certain units" (emphasis supplied)); *cf. Purcaro v. Angelicola*, Case No. CV095014823, 2012 WL 3517614, at *21 (VII) (Conn. Super. Ct. July 20, 2012) (looking to decisions from other jurisdictions and concluding that individual and corporate real estate defendants did not owe a duty to plaintiff injured by optical illusion created by step down when injury did not occur during an open house; and there were no management, maintenance, or repair responsibilities delegated by the listing agreement); *Masick v. McColly Realtors, Inc.*, 858 NE 2d 682, 691 (2) (Ind. Ct. App. 2006) (declining, in a case in which an agent conducted a routine showing of a house under construction, "to impose . . . a duty [to inspect] on real estate brokers who do not have sufficient control over the premises to independently give rise to a duty to warn under recognized premises liability principles").

the broker receives very tangible economic benefits from the relationship with the potential buyers who visit the home. The open house enables the broker to sell the house and to earn a commission. Also, . . . an open house presents a broker with an opportunity to meet and cultivate future clients. More generally, the broker can discuss other listings with visitors and thus promote his or her individual business interests. Thus, the economic benefit that a broker obtains from staging an open house extend[s] beyond the potential sale of the particular property.[19]

Additionally, at an open house, potential buyers "may reasonably expect that the broker [or agent] will be familiar with the premises and would rely on the broker's presumed familiarity with the house, including a knowledge of all of its important features and physical characteristics."[20] And such factors would ordinarily include matters relating to home safety such as "fire or burglar alarms, locks, and the like, and, contrastingly, defects like broken steps, exposed electrical wiring, and missing or weak railings."[21]

But in this case, we are not faced with the potential liability of a broker or agent arising from an injury occurring during an open house. Nevertheless, we find the

---

[19] *Hopkins*, 625 A2d at 1117 (III).

[20] *Id.* at 1118 (III).

[21] *Id.*

reasoning of the relied-upon foreign cases instructive because the circumstances surrounding an open house stand in stark contrast to those presented here. Indeed, it is undisputed that Anna was injured during a *routine* showing of the property by a buyer's agent (Stanley) who had not previously visited the property and who was not accompanied by the listing agent (Alexander). As a result, in the absence of a contractual obligation delegated from Lyons to Metro Brokers or Alexander, as well as the absence of any facts beyond those of a routine showing during which the only agent present was there representing a potential *buyer*, there is no genuine issue of material fact by which a jury could consider Metro Brokers, Alexander, or Stanley to be an occupier of the land for purposes of OCGA § 51-3-1.[22] Likewise, contrary to

---

[22] *See also DeSousa v. Iowa Realty Co.*, 975 NW2d 416, 424 (IV) (Iowa 2022) (holding that "a listing agent who is not present and whose role is limited to granting access does not normally owe a duty of due care to persons viewing the property"); *Lopez v. JP Morgan Chase Bank*, Case No. FBTCV146046621S, 2016 WL 6237590, at *2 (Conn. Super. Ct. Sept. 28, 2016) (holding that broker and listing agent were not possessors or occupiers of property and had no duty to warn when listing agreement provided that the listing broker was "not responsible for the maintenance, management or upkeep of" the listed property, and when defendants were not present at the time of plaintiff's accident during showing); *Lim v. Gillies*, Case No. 1 CA-CV 13-0478, 2014 WL 4980379, at *2 (I) (¶ 10) (Ariz. Ct. App. Oct. 7, 2014) ("Given the undisputed evidence that Seller's Agents did not own or occupy the property, were not responsible for maintaining it, and had no right to immediately possess it, [the plaintiff] failed to raise a material question of fact about whether Seller's Agents possessed the property [during showing at which listing agent was not present].");

14

Kidd's assertions, we do not conclude the broker or agents were "possessors" of the

land as provided for in the Restatement (Third) of Torts § 49.[23]

---

*Butler v. Re/max New Orleans Props., Inc.*, Case No. 2001-2349, 828 So. 2d 43, 47 (La. App. 4 Cir. 2002) (affirming grant of summary judgment in favor of broker and listing agent when "the real estate agent was simply engaged to sell the absentee owner's property," "[t]he Listing Agreement did not give [the agent or broker] the right to make any repairs or provide maintenance to [the] property," and the "mere possession of the keys to the property did not constitute a transfer of custody"); *cf. Smith v. Inman Realty Co.*, 846 SW 2d 819, 822-23 (III) (Tenn. Ct. App. 1992) (holding that broker could be considered a possessor of land for purposes of premises liability when plaintiff was injured inside house under construction after being granted access by an agent for company that listed the property immediately after visiting an open house next door, which was also conducted by the agent and listing company).

[23] *See DeSousa*, 975 NW 2d at 417–18 (I) (Iowa 2022) ("Under the Restatement (Third) of Torts, possessors of land owe a duty of reasonable care to entrants on that land. A possessor is defined as one who occupies and controls land, or one who is entitled to immediately occupy and control land. We have to decide today whether a listing agent who is not present meets the definition of a possessor based merely on the fact that the listing agent has to give permission to prospective buyers and their agents to view the property. We conclude that this gatekeeping function is not by itself enough to make a listing agent a possessor."); Restatement (Third) of Torts: Phys. & Emot. Harm § 49 (2012) (defining a "possessor" of land as "(a) a person who occupies the land and controls it; (b) a person entitled to immediate occupation and control of the land, if no other person is a possessor of the land under Subsection (a); or (c) a person who had occupied the land and controlled it, if no other person subsequently became a possessor under Subsection (a) or (b)").

Although Kidd cites to and relies upon the Restatement (Second) of Torts § 328E, that has been superseded. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 49 cmt. a ("This Section is similar to Restatement Second, Torts § 328E and supersedes it.").

To be clear, we do not hold that real-estate brokers and agents can *never* be considered occupiers of land for purposes of OCGA § 51-3-1,[24] nor does our holding today reach the question of whether, and under what circumstances, a broker or real-estate agent may be held liable for an injury occurring during an open house. Instead, we merely hold that, in *this particular case*, Kidd cannot establish appellees owed a duty of care under these circumstances, and summary judgment was properly granted in favor of Metro Brokers, Alexander, and Stanley.

2. Because we affirm the trial court's grant of summary judgment for the reasons delineated in Division 1, we need not address Kidd's remaining contentions,[25] which are that the trial court erred in granting summary judgment on the grounds that the Brokerage Relationships in Real Estate Transactions Act[26] exempts brokers and

---

[24] *Cf. Gibson v. Rezvanpour*, 268 Ga. App. 377, 379 (2) (601 SE2d 848) (2004) (concluding that the Court need not resolve whether real-estate agents and brokers are liable for failure to keep the premises safe in accordance with OCGA § 51-3-1 because there was no evidence that real-estate agents and brokers had knowledge that dogs at listed home were dangerous).

[25] *See Franklin v. Pitts*, 349 Ga. App. 544, 559 (3) (826 SE2d 427) (2019) (explaining that remaining enumerations were moot and would not be considered when Court affirmed grant of summary judgment on grounds discussed earlier in the opinion); *Plumlee v. Davis*, 221 Ga. App. 848, 852 (4) (473 SE2d 510) (1996) (same).

[26] *See* OCGA § 10-6A-1 *et seq.*

agents from tort liability as a matter of law;[27] Anna was a licensee rather than an invitee;[28] a static condition caused Anna to fall rather than a hidden peril; and a broker is not liable for the negligence of its agents.

For all these reasons, we affirm the trial court's grant of summary judgment in favor of appellees.

*Judgment affirmed. Brown and Padgett, JJ., concur.*

---

[27] Although we need not, and thus do not, address this issue, we are not convinced this Act exempts brokers and agents from premises liability as a matter of law. *See Killearn Partners, Inc. v. Se. Properties, Inc.*, 279 Ga. 144, 144-45 (611 SE2d 26) (2005) (concluding that "nothing in BRRETA indicates that the General Assembly intended to foreclose the availability of remedies outside the Act's scope, including those available under statute and at common law").

[28] Again, we have assumed Anna was an invitee for purposes of this appeal.